**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ATHENS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| *ex. rel.* Ralph Williams, | : | Civil Action No. 3:09-cv-130 (CDL) |
| BRINGING THIS ACTION ON BEHALF | : | |
| OF THE UNITED STATES OF AMERICA, | : | |
| | : | **Filed Under Seal Pursuant** |
| | | **to 31 U.S.C. 3730 (b)(2)** |
| Plaintiff and Relator; | : | |
| | : | |
| v. | | **DO NOT PUT IN PACER** |
| | | **OR SERVE** |
| HEALTH MANAGEMENT ASSOCIATES, INC.; | : | |
| MONROE HMA, LLC d/b/a WALTON REGIONAL | | |
| MEDICAL CENTER; JOHN DOE HOSPITALS | : | |
| AFFILIATED WITH HEALTH MANAGEMENT | : | |
| ASSOCIATES, INC.; | : | |
| | | |
| and | : | |
| | | |
| TENET HEALTHCARE CORPORATION d/b/a | : | |
| ATLANTA MEDICAL CENTER AND NORTH FULTON | : | |
| REGIONAL HOSPITAL; JOHN DOE HOSPITALS | : | |
| AFFILIATED WITH TENET HEALTHCARE | : | |
| COPORATION; | : | |
| | | |
| and | : | |
| | | |
| HISPANIC MEDICAL MANAGEMENT, INC. | : | |
| d/b/a CLINICA DE LA MAMA; CLINICA DE LA | | |
| MAMA, INC., d/b/a CLINICA DE LA MAMA | : | |
| | | |
| Defendants. | : | |

**COMPLAINT**

**Introduction**
**1.**

This is an action brought on behalf of the United States of America by Ralph D. Williams

1

("Relator") against Health Management Associates, Inc.; HMA Monroe, LLC d/b/a Walton

Regional Medical Center; John Doe Hospitals Affiliated with Health Management Associates,

Inc.; Tenet Healthcare Corporation d/b/a Atlanta Medical Center and North Fulton Regional

Hospital; John Doe Hospitals Affiliated with Tenet Healthcare Corporation; and Hispanic

Medical Management, Inc. d/b/a Clinica de la Mama; pursuant to the qui tam provisions of the

False Claims Act, 31 U.S.C. § 3729, et. seq.


### Jurisdictional Statement

2.

This court has jurisdiction over this matter pursuant to 31 U.S.C. §3730(b) and 28 U.S.C.

§ 1331.

3.

Plaintiff-Relator Williams is an individual and a resident of the State of Georgia.

4.

Defendant Health Management Associates, Inc.("HMA, Inc.") a Delaware corporation

doing business in the Middle District of Georgia.  Its headquarters are located at 5811 Pelican

Bay Blvd., Suite 500, Naples, FL 34108-2710.  Service can be had on HMA, Inc. by serving its

registered agent, CT Corporation Systems at 1200 S. Pine Island Rd., Plantation FL 33324.

5.

Defendant HMA Monroe, LLC d/b/a Walton Regional Medial Center in Monroe,

Georgia is a Georgia limited liability company with its principal office located at 5811 Pelican

Bay Blvd., Suite 500, Naples, FL 34108-2710.  Service may be made through HMA Monroe at

its registered agent, CT Corporation Systems, 1201 Peachtree St., Atlanta, GA 30361.

6.

Defendants John Doe Hospitals Affiliated With Health Management Associates, Inc. ("HMA John Doe Hospitals") are hospitals across the United States that are owned and operated by entities that are subsidiaries of or otherwise affiliated with and controlled by Defendant Health Management Associates, Inc.

7.

Defendant Tenet Healthcare Corporation ("Tenet") is a Nevada for profit corporation doing business in the Northern District of Georgia as Atlanta Medical Center and North Fulton Regional Hospital.  Its principal office address is 13737 Noel Road, Suite 100, Dallas, Texas 75240.  Service can be had on Tenet Healthcare Corporation by serving its registered agent, CT Corporation Systems at 1201 Peachtree Street NE, Atlanta, Georgia 30361.

8.

Defendants John Doe Hospitals Affiliated With Tenet Healthcare Corporation ("Tenet John Doe Hospitals") are hospitals across the United States that are owned and operated by entities that are subsidiaries or otherwise affiliated with and controlled by Defendant Tenet Healthcare Corporation, that contracted with Defendant Hispanic Medical Management or an affiliate thereof.

9.

Defendant Hispanic Medical Management, Inc. ("Hispanic Medical") is a Georgia corporation with is principal place of business located at 5127 Jimmy Carter Blvd., Norcross GA 30093.  Service may be made on Hispanic Medical Management through its registered agent,

3

David N. Bryman, 630 Village Trace, Marietta, GA 30067.

10.

Relator Williams is an accountant with thirty years of experience in hospital management in both the for-profit and not-for-profit sectors.

**False Claims Act Violations by Defendants
HMA, Inc., Walton Regional and HMA John Doe Hospitals**

11.

Between April 2009 and October 2009, Defendant HMA, Inc. employed Mr. Williams as the Chief Financial Officer of Defendant HMA Monroe, LLC, d/b/a Walton Regional Medical Center ("Walton Regional") in Monroe, Georgia, with job responsibilities that extended to other HMA affiliated hospitals.

12.

Defendant Walton Regional operates a seventy-seven (77) bed hospital and a fifty-eight (58) bed nursing home in Monroe, Georgia.

13.

Defendant HMA, Inc. operates over fifty (50) hospitals across the United States, four (4) of which are in Georgia:  Walton Regional in Monroe; East Georgia Regional Medical Center in Statesboro; Loganvillle Medical Center in Loganville; and Barrow Regional Medical Center in Winder.

14.

Defendant HMA, Inc. put in place policies designed to increase patient admissions

4

regardless of medical necessity for said admissions at Defendants Walton Regional and HMA John Doe Hospitals.

15.

Mr. Williams's *qui tam* complaint arises under the False Claims Act, 42 U.S.C. 3729, et. seq. ("FCA").

16.

The FCA claims against Defendants HMA, Inc., Walton Regional and HMA John Doe Hospitals are based on the submission of false claims for payment to Medicare or Medicaid ("Government Payors") for medical services that are not medically necessary.

17.

Claims for payment related to services that are not medically necessary are not eligible for reimbursement and are false claims under the False Claims Act ("FCA").

18.

Hospitals are reimbursed by Government Payors at much higher rates for medical services they render to patients that have been admitted to the hospital, as opposed to services rendered to patients treated on an outpatient or observation basis.

19.

Defendants HMA, Inc., Walton Regional and HMA John Doe Hospitals minimize outpatient and "observation" treatment for Medicaid and Medicare beneficiaries and maximize admissions of such patients regardless of the medical necessity of their admissions because Government Payors pay more for services rendered to patients that have been admitted to the hospital.

20.

Hospitals are required by the Medicare/Medicaid conditions of participation to ensure that services to Government beneficiaries are in fact medically necessary.

21.

Hospital providers are required to establish Utilization Review Committees to ensure they are not over utilizing hospital admissions. 42 C.F.R.§ 482.30.

22.

In order for an admission to be considered medically necessary, the patient must have a condition requiring treatment that can only be provided in the inpatient setting. If the patient can safely receive treatment in a less intensive setting, such as outpatient observation, the patient must not be admitted to the hospital and Medicare/Medicaid must not be billed for inpatient services.

23.

If a physician is unsure about the need for an admission or feels that a patient will respond rapidly to treatment, the patient should be placed in outpatient observation. If the physician believes that a patient is acute and requires admission, these facts must be clearly documented in the patient's medical record.

24.

The use of outpatient observation instead of inpatient admission is required when the need for inpatient admission cannot be medically determined and when additional time is needed to evaluate the patient or when the physician believes the patient will respond rapidly to treatment.

25.

Medicare/Medicaid coverage for outpatient observation is limited to a 48-hour period unless the fiscal intermediary grants an exception.

26.

Observation services are defined by CMS as follows: those services furnished by a hospital on its premises, including the use of a bed and at least periodic monitoring by a hospital's nursing or other staff, which are reasonable and necessary to evaluate an outpatient's condition or determine the need for a possible inpatient admission. The purpose of observation is to evaluate and treat a patient's medical condition to determine if there is a need for further treatment or a need for inpatient admission. CMS Manual, Pub. 100-02.

27.

Observation is an outpatient status and a physician's order must specify, "admit to observation" and be signed, dated and timed. When a patient has been in observation status for 24 hours, documentation in the progress notes must include the need to continue observation status with a plan for discharge within the next 12-24 hours or the need to convert to inpatient status, documenting the medical necessity for admission or medical stability for discharge.

28.

The average reimbursement to the hospital provider for an inpatient admission is 3 to 4 times higher than for observation reimbursement.

29.

Defendants acted on that financial incentive for noncompliance and perpetrated frauds on the public fisc by pressuring medical staff and other employees to increase patient admissions.

7

30.

Defendant HMA, Inc. set specific corporate-wide goals for patient admissions, seeking to maximize admissions regardless of medical necessity and minimize observations status. See corporate goals for admissions, attached hereto as Exhibit A.

31.

HMA, Inc. tracked and disseminated each of its hospital's admissions vs. observations and set forth a 'delinquency rate' for each hospital that failed to achieve the corporate goal for the percentage of various patient populations that should be admitted. See memorandum re "delinquency rates," attached hereto as Exhibit B.

32.

Brenda Keeling, HMA, Inc. Corporate Compliance Director, shared with Relator that HMA pressured all of its hospitals to minimize observations and maximize admissions in order to increase provider reimbursement. Ms. Keeling had knowledge of and responsibility for numerous HMA hospitals across the country.

33.

Relator commissioned a study by a third party expert, the Advisory Group out of Washington, D.C., to ascertain if Defendant Walton Regional's admissions and observations were compliant or if over utilization was demonstrated. The report showed significant over utilization of inpatient admissions and under utilization of observation services.

34.

When Relator brought the study to the attention of HMA's corporate controller, Bob Steikes, his response was, "burn it" and no corrective action was taken by Defendant HMA.

8

HMA terminated Relator soon thereafter.

35.

Walton Regional compiled and disseminated to upper management on a daily basis a description of all patients that were 'only' under observation, listing patient names and symptoms, to see if they could be turned into patient admissions at the higher reimbursement rate. See memorandum dated July 14, 2009 from Jenna Jordan, Corporate Director Health Information Management, subject "HIM Scorecard Summary," attached hereto as Exhibit C.

36.

Defendants' scheme to submit false claims for medically unnecessary inpatient services and their systemic over utilization of inpatient admissions has unlawfully inflated Government and private pay reimbursements, fraudulently robbing the public fisc in violation of the False Claims Act.

## False Claims Act and Anti-Kickback Statute Violations by Defendants HMA, Inc., Walton Regional, HMA John Doe Hospitals, Tenet, Tenet John Doe Hospitals and Hispanic Medical Management

37.

Defendant Hispanic Medical Management, Inc. d/b/a Clinica de la Mama ("Hispanic Medical") is a Georgia corporation with offices in Norcross, Lawrenceville, Roswell, Smyrna, Plaza Fiesta (Chamblee), Forest Park, Georgia and Hilton Head, South Carolina.

38.

Defendant Hispanic Medical identifies pregnant Hispanic women, gets them qualified for Medicaid and schedules deliveries of their babies at hospitals with which it has a contractual

retainer agreement for such referrals.

39.

Defendants pay monthly fees to Defendant Hispanic Medical to route pregnant Medicaid beneficiaries to Walton Regional, HMA John Doe Hospitals, Atlanta Medical Center, North Fulton Regional Hospital and Tenet John Doe Hospitals for delivery of their babies at public expense.

40.

Defendant Hospitals billed Government Payors for the obstetric services provided to the women referred by Defendant Hispanic Medical.

41.

Paying or accepting such remuneration for arranging for care under federally funded healthcare programs is prohibited by the Anti-Kickback Act, 42 U.S.C. §1320a-7b(b) ("AKA").

42.

Participation in Medicare is conditioned on compliance with the AKA. Thus any and all claims submitted by a noncompliant hospital which is paying or receiving illegal remuneration are false claims which are also actionable under the FCA.

43.

The AKA prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs.

44.

In pertinent part, the AKA states:

10

(b) Illegal remuneration

(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind --

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

11

42 U.S.C. § 1320a-7b(b).

45.

The AKA arose out of congressional concern that payments to entities who can steer or direct patients, such as Defendant Hispanic Medical, could influence healthcare decisions and result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the program from these difficult to detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to over utilization of federal healthcare services or poor quality of care. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. See Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

46.

Defendants entered into sham contracts to remunerate Hispanic Medical for steering pregnant Medicaid patients to Defendants Walton Regional, HMA John Doe Hospitals, Atlanta Medical Center, North Fulton Regional Hospital and Tenet John Doe Hospitals in direct violation of the Anti-Kickback Act ("AKA").

47.

Defendants HMA, Inc., Walton Regional and HMA John Doe Hospitals knowingly and intentionally conspired to pay Hispanic Medical to send pregnant Medicaid beneficiaries to

12

Walton Regional and other HMA John Doe Hospitals for obstetrical and other physician services ("OB services").

48.

Defendants Tenet Healthcare, Atlanta Medical Center, North Fulton Regional Hospital and Tenet John Doe Hospitals knowingly and intentionally conspired to pay money to Hispanic Medical to encourage the referral of pregnant Medicaid beneficiaries by Hispanic Medical to their hospitals for OB services.

49.

Walton Regional CEO Gary Lang and Relator Williams' predecessor, then-CFO Jeff Grimsley, sought approval from HMA, Inc. Divisional Senior Vice President (Brad Jones) and Divisional Vice President of Finance (Bob Steikes) to enter into the contract with Hispanic Medical.  See Memorandum dated April 2, 2008 from Lang and Grimsley to Jones and Steikes, attached hereto as Exhibit D.

50.

According to Lang and Grimsley, the purpose of the contract was to "grow OB service line volume."  Exhibit D at 1.

51.

CEO Lang and CFO Grimsley's request for approval states, "Clinica [Hispanic Medical] has contracts with two Tenet Health facilities ([Atlanta Medical Center] and North Fulton Regional Hospital) to provide the delivery of services for their patients.  The option to provide an alternative delivery site in the form of [Walton Regional] is very attractive to Clinica and its patients and families."  Exhibit D at 1.  The memorandum also states that there is an agreement

involving two Walton Regional obstetricians "through which on-site clinic support and hospital deliveries will be provided by them in support of this relationship." Id.

52.

Although the language of the contract provides for payment to Hispanic Medical for "interpreter services," such services are not the basis upon which Walton Regional requested corporate approval of the contract and do not play a part at all in the financial feasibility analysis used to support that request. See Services Agreement dated March 24, 2009, attached hereto as Exhibit E.

53.

HMA, Inc. corporate personnel approved the contract. See Memorandum dated April 17, 2008 and Corporate Office Contract Review Summary Sheet, attached hereto as Exhibit F.

54.

The contract was not sent to HMA, Inc. legal staff for review. The Corporate Office Contract Review Summary Sheet, completed as part of the application for approval of the contract, was checked to indicate that legal review was not required. Exhibit F, page 3 of 3.

55.

Mr. Williams joined HMA, Inc. in April 2009 as CFO of Walton Regional.

56.

One of Mr. Williams' duties as CFO of Walton Regional was monitoring contracts and approving payment of invoices submitted pursuant thereto.

57.

Walton Regional used a computerized contract monitoring system that flagged expiration

dates and other important information about its contracts.  The Walton CFO was responsible for inputting contractual information into the system.

58.

Mr. Williams' predecessor CFO had not put the Hispanic Medical contract into the contract monitoring system.  Mr. Williams found this omission very unusual and outside of normal business practices.

59.

Relator found the hard copy of the Hispanic Medical contract in his desk drawer.

60.

The financial feasibility analysis submitted to HMA. Inc, corporate in support of the contract lays out the expectation that payments to Hispanic Medical will result in a significant increase in deliveries at Walton Regional, all of which to be paid for with Medicaid reimbursements.  See HMA, Inc. Financial Feasibility Analysis for "Clinica de la Mama Hispanic Maternity Program," attached hereto as Exhibit G.

61.

Over a five year period, Defendants HMA, Inc. and Walton Regional expected to reap a 56.2% rate of return on their $1,878,000 in unlawful inducements to Defendant Hispanic Medical under the "Hispanic Maternity Program."  Exhibit G at 1.  This projection of the ill-gotten gains expected from of the kickback scheme clearly sets forth the motive behind the bogus contractual relationship with Hispanic Medical.

62.

Hispanic Medical makes a record of the maternity deliveries of each of the pregnant

15

Government beneficiaries it delivers or refers to hospitals under contract. Samples of such records for deliveries at Walton Regional are included in Exhibit K hereto, discussed below. It is believed that Hispanic Medical, the kickback recipient, also tracks and documents OB deliveries it refers to HMA John Doe Hospitals, Atlanta Medical Center, North Fulton Regional and Tenet John Doe Hospitals.

63.

According to the Director of OB Services and the Director of Nursing, as of April 23, 2009 there had been 34 'Clinica deliveries' since January 1, 2009. See Email exchange dated April 23, 2009, attached hereto as Exhibit H.

64.

Relator eventually discerned that Defendant Walton Regional paid Defendant Hispanic Medical between $15,000 and $20,000 each month as remuneration for referring pregnant Hispanic Medicaid beneficiaries to Walton Regional for the government subsidized delivery of their babies. See Contract, Exhibit E hereto.

65.

Walton Regional billed Medicaid and received between $2,854 (well baby normal delivery) and $4,550 (well baby c-section) for each delivery.

66.

Relator Williams received the monthly invoices from Hispanic Medical. He reviewed the contract and investigated what, if any, interpreter services Hispanic Medical was providing at Walton Regional. He found none.

16

67.

The Director of Nursing Services said Walton Regional used AT&T when a need arose for interpreter services. She did not use interpreter services from Hispanic Medical. She was not familiar with Hispanic Medical personnel. See email exchange dated August 20, 2009, attached hereto as Exhibit I.

68.

Relator asked the Director of OB Services at Walton Regional why Walton Regional needed Hispanic Medical for interpretation services. She replied, "I think this is a question for Sharon [director of Nursing] or Gary [CEO]. The contract was negotiated prior to my role as manager. I have never seen the contract." See email exchange dated August 20, 2009 between Erica Zygler and Relator, attached hereto as Exhibit J.

69.

Relator Williams also spoke to HR personnel and they also had no knowledge of Hispanic Medical personnel rendering interpreter services.

70.

Defendants HMA, Inc. and Walton Regional are knowingly violating the AKA and at least the two Atlanta-area Tenet hospitals are doing so as well.

71.

Walton Regional's CEO Gary Lang told Relator Williams that Lang came to HMA from a Tenet hospital in Hilton Head, South Carolina that had the same contract with Hispanic Medical. The Tenet hospitals paid Hispanic Medical to refer Hispanic OB patients eligible for Medicaid and thereafter to direct the pregnant Hispanic Medicaid beneficiaries to a Tenet

hospital for delivery at Medicaid expense.

72.

Relator confirmed with Defendant Hispanic Medical that it has contractual arrangements with Tenet's Atlanta Medical Center and North Fulton Regional Hospital. The pattern of conduct discovered at the HMA hospitals is repeated at the Tenet hospitals as well.

73.

Hispanic Medical was paid to bring pregnant Medicaid beneficiaries to Defendants' hospitals. The notion of paying for interpreter services was a hoax and proves that all parties to these arrangements conspired to violate the AKA.

74.

Soon after he became CFO of Walton Regional, Relator Williams discovered the unlawful kickback arrangement and complained about its illegality to management.

75.

Relator Williams reported to CEO Lang that the arrangement with Hispanic Medical violated the Anti-Kickback Act because payments to Hispanic Medical were purely inducements to bring Medicaid beneficiaries into Walton Regional for government-paid OB delivery services.

76.

CEO Lang initially defended the arrangement but told Relator he would discuss it with HMA, Inc legal staff.

77.

Soon thereafter, Lang terminated the contract with Hispanic Medical abruptly and not in conformity with the terms of the contract.

18

78.

In response to the termination, Hispanic Medical sent a pleasant cover letter and a final invoice to Walton Regional, which material was forwarded to Relator for processing. See Letter from Tracy Cota to CEO Gary Lang, dated August 6, 2009, with final invoice and supporting materials, attached hereto as Exhibit K.

79.

The final invoice includes a report entitled "Schedule of Deliveries By Hospital" for August 2009 and September 2009. See Exhibit K, pp. 6 - 10. The report includes patient names, Medicaid approval status, estimated delivery dates and which of the five Hispanic Medical clinics would be handling the patient. Id. The Final Invoice also includes a report entitled "Deliveries by Month By Hospital." Exhibit K, pp. 11 and 19. That report shows patient names and dates of OB deliveries at Walton Regional in July and June 2009. Id.

80.

The final invoice dated August 6, 2009 includes purported time records for Hispanic Medical personnel at Walton Regional:  Fully 238.75 hours of time was billed for the 18 day period of July 1, 2009 through July 18, 2009. See Exhibit K, p 2. That is an average of 13.26 hours of each day covered by the invoice during which Hispanic Medical personnel were purportedly providing interpreter services at Walton Regional.   Similarly, the partial invoice, dated July 8, 2009, includes purported time records for Hispanic Medical personnel at Walton Regional for June 2009:  Fully 412.50 hours of time was billed for the 30 day month of June. See Exhibit K, p. 13.  That is an average of 13.75 hours a day during which Hispanic Medical personnel were purportedly providing interpreter services at Walton Regional.

19

81.

Not long after Mr. Williams raised the fraudulent nature of the arrangement with Hispanic Medical with CEO Lang, HMA, Inc. sent Divisional VP Bob Steikes to Monroe where he summarily terminated Mr. Williams' employment without providing any reason for the termination.

82.

HMA, Inc. and Walton Regional had been bringing in substantial revenue from Medicaid reimbursements for the delivery-for-a-fee scheme with Hispanic Medical and Mr. Williams' objections were not acceptable.

83.

Due to Williams' protestations to HMA management about the on-going fraud and abuse, Defendant HMA, Inc. retaliated against Williams by firing him.

## COUNT ONE

## VIOLATION OF THE FALSE CLAIMS ACT
### (31 U.S.C. §3729, et. seq.)

84.

Paragraphs 1 through 36 are incorporated into Count One as if fully set forth herein.

85.

This is a Civil Action brought by Relator on behalf of the United States against the Defendants pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3729(a)(1) and (2) as well as 31 U.S.C. §3730(b).

86.

The Defendants knowingly presented or caused to be presented false and fraudulent claims for payment to federally-funded health insurance programs, in violation of 31 U.S.C. §3729(a)(1)(A).  Defendants systematically filed claims for inpatient admissions of Government beneficiaries where no medical necessity was present to support such inpatient admissions.  A lower level of care such as outpatient service should have been provided and charged to Government Payors rather than the much higher rate claimed for inpatient admissions.

87.

The Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, made, used, caused to be made, or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved, in violation of, inter alia, 31 U.S.C. §3729(a)(1)(B).  At the highest management levels on down, Defendants pressured hospitals to meet corporate financial goals by admitting patients to the hospital regardless of how sick the patients were at the time of admission.

88.

In violating the False Claims Act, the Defendants acted in concert, with the specific intent of conspiring for their mutual profit and gain to the detriment of the taxpayers of the United States, in violation of 31 U.S.C §3729(a)(1)(C).

21

## COUNT TWO

## VIOLATION OF ANTI-KICKBACK ACT (42 U.S.C. §1320(a)-7(b) *et seq.*) and FALSE CLAIMS ACT (31 U.S.C. §3729, et. seq.)

89.

Paragraphs 1 through 13 and 37 through 83 are incorporated into Count Two as if fully set forth herein.

90.

Defendants' conduct described herein constitutes violations of the FCA and the AKA.

91.

The Federal Anti-Kickback Act makes it a crime to knowingly offer, pay, solicit or receive any remuneration to induce a person to refer a person for the furnishing of any service covered under a federal healthcare program.

92.

Defendants knowingly and willfully acted in violation of the AKA and the FCA.

93.

The providing of remuneration in exchange for Defendant Hispanic Medical's referring, recommending and arranging for Medicaid beneficiaries to deliver their babies at the defendant hospitals as described previously in this Complaint constitutes an illegal inducement under the Anti-Kickback Act and violates the FCA.

94.

Defendants falsely certified compliance with the Anti-Kickback Act and thereby submitted false claims to Government Payors for OB services associated with referrals from

Hispanic Medical.

95.

Compliance with the Anti-Kickback Act is a condition for participation in Medicare and Medicaid so that once Defendants violated the AKA, they were no longer eligible for reimbursements from those Government Payors, yet they continued to submit false claims to those Payors on virtually a daily basis.

96.

As a direct of Defendants actions, government payors /the public fisc have been directly damaged.

WHEREFORE, Relator prays for judgment against Defendants as follows:

(a)      Defendants be ordered to cease and desist from submitting and/or causing the submission of any more false claims or in any way from otherwise violating 31 U.S.C. §3729 *et seq.*

(b)      That judgment be entered in Relator's favor and against Defendants in the amount of each and every false or fraudulent claim and so multiplied as provided by 31 U.S.C. §3729(a), plus a civil penalty of not less than Five Thousand, Five Hundred ($5,500.00) Dollars nor more than Eleven Thousand ($11,000.00) Dollars per claim, as provided by 31 U.S.C. §3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants together with penalties for specific claims to be identified at trial after full discovery;

(c)      That Relator be awarded the maximum amount allowed pursuant to the Anti-

Kickback Act and False Claims Act as cited and referenced herein.

     (d)     That judgment be granted for Relator and the United States and against Defendants for any costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit;

     (e)     That Relator and the United States be entitled to any and other relief that they are entitled to, whether by law or equity;

This 1st day of December, 2009.

Respectfully submitted:

Wilbanks & Bridges LLP

By:                                 
Marlan B. Wilbanks
Georgia Bar No. 758223
Tyrone M. Bridges
Georgia Bar No. 081500

Counsel for Relator

24